UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LENA BIESCHKE,

        Plaintiff,                                    Hon. Paul L. Maloney

v.                                            Case No. 1:07-CV-1125

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.
_____/

## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and

XVI of the Social Security Act.  Section 405(g) limits the Court to a review of the administrative

record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall

be conclusive.

Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges

to submit proposed findings of fact and recommendations for disposition of social security appeals,

the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process.  *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988).  The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision.  *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility.  *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence.  *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance.  *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted).  It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993).  In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight.  *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 32 years of age at the time of the ALJ's decision. (Tr. 25, 61). She successfully completed high school and worked previously as a nurse's assistant, deli manager, sales clerk, and building cleaner. (Tr. 127-33).

Plaintiff applied for disability benefits on February 7, 2004, alleging that she had been disabled since September 1, 2000, due to asthma, bulging discs, arthritis, and depression. (Tr. 61-63, 85, 101, 164-66). Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 27-60, 167-80). On October 13, 2005, Plaintiff appeared before ALJ James Prothro, with testimony being offered by Plaintiff and vocational expert, James Lozer. (Tr. 569-99). In a written decision dated November 18, 2005, the ALJ determined that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 17-25). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 5-8). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

On January 3, 2001, Plaintiff reported to the emergency room complaining that she had recently slipped and fell "while in a pool, striking her low back." (Tr. 186). Plaintiff reported that she was not experiencing difficulty ambulating or any pain in her lower extremities. (Tr. 186). An examination of Plaintiff's back revealed "no tenderness or obvious deformity." (Tr. 187). Plaintiff complained that she had obtained only "minimal" relief with Motrin. (Tr. 186). Plaintiff was given several pain medications and discharged home. (Tr. 187).

On May 31, 2001, Plaintiff reported to the emergency room. (Tr. 190-94). Plaintiff reported that she injured her right shoulder "while wrest[l]ing with her kids." (Tr. 190). Plaintiff reported that she "was flipping her kids over her head" when she "heard a pop" in her shoulder. (Tr. 190). The doctor noted that Plaintiff was in no distress. (Tr. 190). Plaintiff exhibited decreased range of motion in her shoulder, but there was no evidence of neck tenderness or loss of grip strength. (Tr. 191). X-rays of Plaintiff's right shoulder were "normal." (Tr. 194). Plaintiff was given pain medication and discharged home. (Tr. 191).

On July 1, 2001, Plaintiff reported to the emergency room complaining of right foot pain. (Tr. 209-10). Plaintiff reported that she was unable to stand for a "prolonged period of time" which concerned her because she "is on her feet a good portion of the time" at her job. (Tr. 209). Plaintiff denied falling and reported that she did not experience any ankle pain. (Tr. 209). The doctor noted that Plaintiff was in no apparent distress. (Tr. 209). An examination of Plaintiff's right foot revealed "mild" swelling and "moderate" tenderness, but no other abnormality. (Tr. 209). X-rays of Plaintiff's right foot were negative. (Tr. 211). Plaintiff was given pain medication and discharged home. (Tr. 210).

4

On July 18, 2001, Plaintiff reported to the emergency room complaining of a migraine headache with "some mild photophobia." (Tr. 212-17). The results of an examination were unremarkable. (Tr. 212-17). Plaintiff was given several pain medications and discharged home. (Tr. 213, 216).

On October 1, 2001, Plaintiff reported to the emergency room. (Tr. 225). Plaintiff reported that she "was playing with her husband when she jumped off a porch" injuring her right hip. (Tr. 225). An examination of Plaintiff's hip revealed tenderness, but no evidence of neurovascular abnormality, tendon function abnormality, or gross bony deformity. (Tr. 225). X-rays of Plaintiff's right hip were unremarkable. (Tr. 226). Plaintiff was given pain medication and discharged home. (Tr. 225).

On December 18, 2001, Plaintiff reported to the emergency room complaining of low back pain. (Tr. 244-45). An examination of Plaintiff's lower back revealed tenderness, but there was no evidence of motor, sensory, neurological, or gait abnormality. (Tr. 244). Plaintiff was given pain medication and discharged home. (Tr. 244-45).

X-rays of Plaintiff's lumbar spine, taken on January 7, 2002, were "normal" with no evidence of spondylolysis, spondylolisthesis, fracture, bony abnormality, misalignment, or soft tissue abnormality. (Tr. 429).

Plaintiff began physical therapy on January 14, 2002. (Tr. 263-65). Plaintiff reported that she was experiencing back pain which "on average" rated as 8 out of 10 and "at its worst" rated as 10 out of 10. (Tr. 264). Treatment notes dated January 24, 2002, however, reveal that Plaintiff "did not show for remaining scheduled visits." (Tr. 261).

5

On March 20, 2002, Plaintiff reported to the emergency room complaining of pain in her neck and right shoulder. (Tr. 269-70). The results of an examination revealed tenderness, but were otherwise unremarkable. (Tr. 269-72). X-rays of Plaintiff's right shoulder and cervical spine revealed no evidence of abnormality. (Tr. 273). Plaintiff was given pain medication and discharged home. (Tr. 269-72).

On June 2, 2002, Plaintiff reported to the emergency room, complaining of headaches and neck and back pain. (Tr. 274-78). An examination of Plaintiff's neck was unremarkable. (Tr. 275). Plaintiff exhibited no motor, sensory, or neurological abnormality. (Tr. 275). Plaintiff exhibited "full range of motion in all joints with no joint swelling or tenderness." (Tr. 276). Plaintiff was given morphine and discharged home. (Tr. 274-78).

On June 15, 2002, Plaintiff reported to the emergency room, complaining of a headache with photophobia and nausea. (Tr. 279-80). The results of an examination were unremarkable. (Tr. 279). Plaintiff was given Demerol and Dilaudid and discharged home. (Tr. 280).

On July 6, 2002, Plaintiff reported to the emergency room, complaining of "severe neck pain." (Tr. 283-84). Plaintiff reported that she "cannot move her neck to the left or right." (Tr. 283). An examination of Plaintiff's neck revealed "muscle tenderness." (Tr. 284). Plaintiff was given pain medication and discharged home. (Tr. 284).

On July 26, 2002, Plaintiff participated in an MRI examination of her brain, the results of which were "normal." (Tr. 427).

6

On October 17, 2002, Plaintiff reported to the emergency room, complaining of right ankle pain. (Tr. 292-93). An examination of Plaintiff's ankle was unremarkable and x-rays were negative. (Tr. 292-94). Plaintiff was given pain medication and discharged home. (Tr. 292-93).

X-rays of Plaintiff's right ankle, taken on October 22, 2002, were "within normal limits." (Tr. 426).

On December 13, 2002, Plaintiff was examined by Dr. Edwin Kornoelje. (Tr. 421). Plaintiff reported that she was experiencing low back pain. (Tr. 421). An examination of Plaintiff's lumbar spine revealed tenderness, but straight leg raising was negative and Plaintiff exhibited "good" range of motion. (Tr. 421). X-rays of Plaintiff's lumbar spine revealed "narrowing of the L5-S1 disc space," but no evidence of fracture, subluxation, or misalignment. (Tr. 425).

On August 4, 2003, Plaintiff was examined by Dr. Kornoelje. (Tr. 417-18). An examination of Plaintiff's back revealed "very minimal tenderness" and "slightly decreased range of motion." (Tr. 417). Straight leg raising was negative and there was no evidence of strength or sensory abnormality. (Tr. 417). Dr. Kornoelje refilled Plaintiff's prescriptions for Vicodin and Valium, but noted that Plaintiff "should try to wean off of these." (Tr. 418).

On August 25, 2003, Plaintiff participated in an MRI examination of her lumbosacral spine, the results of which revealed "mild degenerative disc changes" at L4-5 and L5-S1. (Tr. 344). X-rays of Plaintiff's lumbar spine, taken the same day, revealed "mild degenerative changes" at L5-S1. (Tr. 345).

Plaintiff was examined by Dr. Kornoelje on September 4, 2003. (Tr. 415-16). An examination of Plaintiff's spine revealed "mild" tenderness. (Tr. 415). Plaintiff was instructed to attend physical therapy. (Tr. 415). Plaintiff began participating in physical therapy on September

7

8, 2003.  (Tr. 397-99).  Plaintiff was scheduled to attend 2-3 therapy sessions weekly for 4-6 weeks, but unilaterally discontinued therapy after only two sessions.  (Tr. 389-99).

On November 6, 2003, Plaintiff was examined by Dr. Farook Kidwai.  (Tr. 386-88).  The doctor performed "provocative tests for apophyseal arthritis or irritation," the results of which were positive.  (Tr. 387).  An examination of Plaintiff's cervical spine revealed dysesthesia at C2-3.  (Tr. 387).  Straight leg raising and foraminal compression tests were negative.  (Tr. 387).  The doctor observed no evidence of motor or radicular deficits.  (Tr. 387).  Dr. Kidwai treated Plaintiff with a facet block injection at L4-5 which "resolved the symptoms in her back."  (Tr. 385).

On November 10, 2003, Plaintiff was examined by Dr. Kornoelje.  (Tr. 404-05).  Plaintiff reported that she was "fatigued" and "rundown."  (Tr. 405).  Plaintiff also reported that while she was experienced "some discomfort" in her lumbar spine, she "has continued to work."  (Tr. 405).  The doctor instructed Plaintiff to improve her diet and begin walking for exercise.  (Tr. 404-05).

On February 2, 2004, Plaintiff was examined by Dr. Kornoelje.  (Tr. 401).  The doctor reported "no significant change" with respect to Plaintiff's back.  (Tr. 401).  On February 12, 2004, Plaintiff participated in a nerve conduction study of her right lower extremity, the results of which were "normal."  (Tr. 442).

On March 6, 2004, Plaintiff completed a report concerning her activities.  (Tr. 108-15).  Plaintiff reported that after getting her children ready for school every morning, she washes laundry, cleans her house, and prepares lunch and dinner.  (Tr. 109-11).  Plaintiff reported that she also watches television, plays video games, and goes shopping.  (Tr. 112).  Plaintiff reported that she can lift 10-20 pounds, stand for 30 minutes, sit for 30 minutes, and walk for 20 minutes. (Tr. 113).

8

On May 21, 2004, Plaintiff participated in a consultive examination conducted by Wayne Kinzie, Ph.D. (Tr. 453-57). Plaintiff reported that she suffers from lower back pain that "makes [her] scream" and that she is unable to bend or twist. (Tr. 453). Plaintiff also reported, however, that she was presently employed working 32 hours weekly as a patient care provider. (Tr. 453). The results of a mental status examination were unremarkable. (Tr. 454-56). Plaintiff was diagnosed with dysthymic disorder and her GAF score was rated as 58.[1] (Tr. 457).

On May 25, 2004, Matthew Rushlau, Ed.D. completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 459-72). Determining that Plaintiff suffered from dysthymia, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) of the Listing of Impairments. (Tr. 460-68). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular Listing. (Tr. 469). Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and never experienced episodes of decompensation. (Tr. 469). Dr. Rushlau concluded that "based on the evidence in the file, the claimant does not appear to be significantly limited by her emotional problem." (Tr. 471).

On July 16, 2004, Plaintiff was examined by Dr. Kornoelje. (Tr. 493). Plaintiff reported that she was experiencing low back pain. (Tr. 493). Plaintiff was "in no acute distress."

---

[1] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 58 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

(Tr. 493).  Straight leg raising was negative and there was no evidence of strength or sensory abnormality.  (Tr. 493).

On December 7, 2004, Plaintiff contacted Dr. Kornoelje's office requesting "more morphine."  (Tr. 515).  The doctor denied Plaintiff's request, informing Plaintiff that she would have to "wait until it is time for her next refill."  (Tr. 515).  Plaintiff then had her husband telephone Dr. Kornoelje's office to ask if "they can get [Plaintiff's morphine] any earlier."  (Tr. 516).  The doctor declined.  (Tr. 516).

X-rays of Plaintiff's lumbar spine, taken January 22, 2005, were "normal."  (Tr. 506).

On March 1, 2005, Plaintiff was examined by Dr. Kornoelje.  (Tr. 478).  Plaintiff reported that she was exercising at home.  (Tr. 478).  Plaintiff reported that her back "had bothered her," but that "otherwise she is stable."  (Tr. 478).  An examination of Plaintiff's spine revealed tenderness to palpation, but straight leg raising was negative.  (Tr. 478).

On May 26, 2005, Plaintiff described her back pain as "quite bothersome."  (Tr. 477).  A June 9, 2005 examination revealed that Plaintiff was "doing okay" with "no significant change in her condition."  (Tr. 476).

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability.  *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[2]  If the Commissioner can make a

---

[2] 1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

## B.  The ALJ's Decision

The ALJ determined that Plaintiff suffered from the following severe impairments: (1) back disorder, and (2) obesity. (Tr. 19). The ALJ further determined, however, that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 19). The ALJ concluded that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 22-24). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

---

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

### 1. The ALJ's Decision is Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work subject to the following limitations: (1) she can occasionally lift/carry 20 pounds; (2) she can frequently lift/carry 10 pounds; (3) she can stand and/or walk at least 2 hours during an 8-hour workday; (4) she can sit for 6 hours during an 8-hour workday; (5) she can perform unlimited pushing and pulling activities; (6) she cannot perform frequent overhead reaching; (7) she can occasionally balance, stoop, kneel, crouch, crawl, or climb ramps/stairs; (8) she can never climb ladders, ropes, or scaffolds; (9) she must avoid concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, poor ventilation, moving machinery, and unprotected heights. (Tr. 22). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

12

The ALJ determined that Plaintiff was unable to perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding.  *See Richardson*, 735 F.2d at 964.  While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added).  This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy.  *See Richardson*, 735 F.2d at 964.  Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert James Lozer.

The vocational expert testified that there existed approximately 17,000 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding.  (Tr. 594-97).  This represents a significant number of jobs.  *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold).

13

a.   The ALJ Properly Evaluated the Medical Evidence

On October 6, 2005, Plaintiff's counsel questioned Dr. Kornoelje concerning Plaintiff's application for disability benefits.  (Tr. 555-62).  During this questioning, the following exchange occurred:

Counsel:      Do you talk with your patients when you're prescribing drugs like Morphine or Valium about those potential side effects?

Dr. Kornoelje:   Oh yea, yea, yea.  You know I am, as many physicians are, leery of, a little bit leery of using these types, not because they don't want to treat somebody's pain.  Certainly that's one of the things we need to do.  It's just that because of several things related to those types.  They have street value, which can be a problem and I'm not concerned about that at all with her, but also they can be quite sedating.  And actually another thing as I'm looking, she's also on Neurontin which is a pain modulator.  And so we have her on that which is not near as sedating.  It may cause a little drowsiness as well, but certainly not near as sedating.  So we try to use even that to maybe keep the Morphine down just a little bit.  But you're going to get some sedation issues with Morphine as well.

(Tr. 559).

Shortly thereafter, the following exchange occurred:

Counsel:      Do you know whether the Morphine has in fact been causing daytime drowsiness for her?

Dr. Kornoelje:   She complains of being fatigued and tired and I believe, I'm just looking back, that she's had periodic labs that kind of looked at her blood count and she's not anemic and so forth, and so it certainly makes sense that if someone's taking that dose of Morphine that it's going to cause daytime tiredness and sleepiness.

(Tr. 560).

Plaintiff asserts that these statements by Dr. Kornoelje constitute a medical opinion from her treating physician which is entitled to controlling weight.  At the administrative hearing,

14

the vocational expert testified that if Plaintiff's medication regimen required her to take a "one or two hour nap in the morning and a two or three hour nap in the afternoon,"[3] that there existed no jobs which she could perform.  (Tr. 598).  Plaintiff asserts that Dr. Kornoelje's statement, when considered in conjunction with the vocational expert's testimony, establishes that she is disabled.  Thus, Plaintiff asserts that she is entitled to relief because the ALJ improperly "disregarded" the opinion of her treating physician.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into her medical condition.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  Accordingly, the medical opinions and diagnoses of treating physicians are given substantial deference, and if such opinions and diagnoses are uncontradicted, complete deference is appropriate.  *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

Nonetheless, the ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence.  *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

As the Sixth Circuit has held, when an ALJ chooses to accord less than controlling weight to the opinion of a treating physician, he must adequately articulate his rationale for doing

---

[3]  This question was prompted by Plaintiff's testimony that her medication causes her to nap for 1-2 hours every morning and 2-3 hours every afternoon.  (Tr. 587-88).

so.  *See Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544-47 (6th Cir. 2004).  As the

*Wilson* court held:

> If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors - namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source - in determining what weight to give the opinion.
>
> Importantly for this case, the regulation also contains a clear procedural requirement: "We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion."  A Social Security Ruling explains that, pursuant to this provision, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Id.* at 544 (internal citations omitted).

As the *Wilson* court further held, failure to comply with this requirement is not subject

to harmless error analysis.  *Id.* at 546-47.  As the court expressly stated:

> A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely. . .To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with § 1527(d)(2), would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory.

*Id.* at 546 (internal citations omitted).

Plaintiff's argument fails for several reasons.  The statements by Dr. Kornoelje,

quoted above, do not constitute a medical "opinion" as that term is contemplated by the relevant

16

regulations.  Moreover, even if the Court assumes that the doctor's statements constitute a "medical opinion" as Plaintiff alleges, her claim nonetheless fails for two reasons.  First, the ALJ did not "disregard" Dr. Kornoelje's statements concerning the potential sedating effects of Plaintiff's medication.  Instead, the ALJ expressly acknowledged the doctor's statements and provided a valid rationale for concluding that Plaintiff's medications do not cause the side effects alleged.  Moreover, Dr. Kornoelje's statements, even if interpreted as Plaintiff asserts, do not establish that Plaintiff is disabled.

The relevant Social Security regulation defines a "medical opinion" as a statement that "reflect[s] judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2).

As noted above, Dr. Kornoelje did *not* testify that Plaintiff experienced drowsiness as a result of her medication regimen, but instead merely stated that such was *possible*.  Dr. Kornoelje's statement does not constitute an "opinion" for purposes of 20 C.F.R. § 404.1527(a)(2).  The doctor's statement does not reflect any judgment about the nature of Plaintiff's impairments or articulate any limitations on her ability to function.  Rather, the doctor merely noted that Plaintiff's medications *could* cause drowsiness.  The fact that a medication *can* cause drowsiness does not lead to the conclusion that the medication *does* cause drowsiness in any particular individual.  Because the statements in question do not constitute a "medical opinion," the requirements of the treating physician doctrine simply do not apply.

Even if the Court assumes that the statements in question do constitute a "medical opinion," Plaintiff's claim is without merit.  Contrary to Plaintiff's argument, the ALJ did not

17

disregard the doctor's statements concerning the potential sedating effects of Plaintiff's medication. The ALJ expressly recognized these statements, but concluded that Plaintiff does not suffer the sedating side effects she alleged. In reaching this conclusion, the ALJ noted Dr. Kornoelje's testimony that his concerns about the potential sedating effects of Plaintiff's medication was lessened because she was also taking Neurontin. (Tr. 21). The ALJ noted Dr. Kornoelje's testimony that lab tests on Plaintiff's blood had revealed no evidence of abnormality. (Tr. 21). The ALJ also found that Plaintiff's allegations regarding the sedating effects of her medication were not credible in light of the evidence of record. (Tr. 21). In this respect, the Court notes that the contemporaneous treatment notes of Plaintiff's care providers do not support Plaintiff's testimony that her medications compel her to sleep for 3-5 hours each day.

Finally, even if the Court interprets Dr. Kornoelje's statements as asserted by Plaintiff, such do not establish that she is disabled. Plaintiff's argument is that given Dr. Kornoelje's statements, the ALJ was obligated to adopt the vocational expert's testimony that "daytime sedation" precludes all employment, thus leading to the conclusion that she is disabled. However, even if interpreted in a manner most favorable to Plaintiff, Dr. Kornoelje's statements do not compel the ALJ to adopt the vocational expert's testimony.

The vocational expert testified that if Plaintiff's medication caused her to sleep 1-2 hours in the morning and 2-3 hours in the afternoon, that there existed no jobs which she could perform. There is absolutely nothing in Dr. Kornoelje's statement suggesting that Plaintiff's medication requires her to sleep for any length of time during the day, let alone 3-5 hours every day. Dr. Kornoelje's statement, *at most*, indicates that Plaintiff's medication causes Plaintiff to experience fatigue. The doctor never indicated that Plaintiff's medication, or any side-effects resulting

18

therefrom, were work preclusive or impaired Plaintiff to an extent inconsistent with the ALJ's RFC determination.

In sum, for the reasons discussed herein, the Court finds that the ALJ properly evaluated and considered Dr. Kornoelje's statements concerning the potential side effects of Plaintiff's medication.

### b.   The ALJ Properly Evaluated Plaintiff's Obesity

Plaintiff asserts that this matter must be remanded to the Commissioner because of the ALJ's failure to properly consider her obesity.  Specifically, Plaintiff asserts that the ALJ failed to comply with Social Security Ruling 02-1p.  The Court concludes that even if the ALJ failed to comply with this Ruling, such failure is harmless making a remand unnecessary.

Social Security Ruling 02-1p was articulated "to provide guidance on SSA policy concerning the evaluation of obesity in disability claims."  Titles II and XVI: Evaluation of Obesity, SSR 02-1p, 2000 WL 628049 at *1 (S.S.A., Sept. 12, 2002).  This policy recognizes that obesity often "leads to" or "complicates" a claimant's impairments.  *Id.* at *3.  Accordingly, the ALJ is required to "consider obesity" when determining whether: (1) a claimant has a medically determinable impairment; (2) whether any such impairment(s) is severe; (3) whether the claimant's impairment meet or equal the requirements of a listed impairment; (4) whether the claimant's impairments prevent her from performing her past relevant work or other work that exists in significant numbers.  *Id.* at *3.

The ALJ complied with these requirements.  The ALJ recognized that Plaintiff is obese and that such constitutes a severe impairment.  (Tr. 19).  The ALJ considered Plaintiff's

19

impairments, including her obesity, and concluded that her impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 19). The ALJ further concluded that while Plaintiff's impairments, including her obesity, prevented her from performing her past relevant work, there nonetheless existed a significant number of jobs which she could perform despite her impairments. (Tr. 22-24). As discussed above, these various determinations are supported by substantial evidence.

Plaintiff asserts, however, that the ALJ erred by failing to *separately analyze* her obesity and the manner and extent to which it "impacts physical or mental functions." Plaintiff asserts that the ALJ's failure in this regard violates Ruling 02-1p, but Plaintiff fails to identify any language in this Ruling that supports her interpretation thereof. The Court, however, discerns no such requirement in this Ruling. The Court's conclusion is informed by the rationale underlying the enactment of Ruling 02-1p.

Social Security regulations used to recognize obesity as a listed impairment (Section 9.09), but this section of the Listings was eliminated effective October 25, 1999. *See* Titles II and XVI: Evaluation of Obesity, SSR 02-1p, 2000 WL 628049 at *1 (S.S.A., Sept. 12, 2002). Section 9.09 was removed from the Listings not because the Social Security Administration no longer considered obesity to be a severe or adverse impairment. Instead, Section 9.09 was removed because "the criteria in the listing were not appropriate indicators of listing-level severity." Certain changes were made to other listed impairments "to ensure that obesity is still addressed in [the] listings." Social Security Ruling 00-3p, since superceded by Ruling 02-1p, was also enacted to "provide additional guidance" as to how to properly evaluate a claimant's obesity. *Id.*

20

A review of Ruling 02-1p reveals that the concern underlying its passage was not that obesity be treated differently from other impairments or be elevated in status. As Plaintiff correctly recognizes, "obesity is not a unique impairment requiring special handling and explanation." (Dkt. #9 at 14). Instead, this Ruling was enacted to ensure, despite the elimination of Section 9.09, that obesity and its effects would continue to be properly considered by ALJs. *See* Titles II and XVI: Evaluation of Obesity, SSR 02-1p, 2000 WL 628049 at *1-7 (S.S.A., Sept. 12, 2002). As discussed above, the ALJ considered Plaintiff's obesity and found that it was a severe impairment, as it "significantly affect[ed] her ability to do basic work activities." (Tr. 19). Having made this determination, the ALJ obviously considered Plaintiff's obesity in assessing Plaintiff's RFC and determining whether there existed work which Plaintiff could perform consistent with her RFC.

The Court, therefore, finds no error in the ALJ's analysis. However, even if Plaintiff is correct that the ALJ was required to separately analyze her obesity and its impact on her ability to perform work activities, the Court finds that the ALJ's error was harmless. The ALJ expressly considered Plaintiff's obesity when assessing her residual functional capacity. The ALJ's RFC determination is supported by substantial evidence and the medical record does not indicate that Plaintiff's obesity impairs her to an extent beyond that recognized by the ALJ. Thus, even if the ALJ failed to make specific findings regarding Plaintiff's obesity, the Court finds that any such error is harmless. *See Heston v. Commissioner of Social Security*, 245 F.3d 528, 535-36 (6th Cir. 2001) (recognizing that remand to correct an error committed by the ALJ unnecessary where such error was harmless); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("no principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"); *Berryhill v. Shalala*, 1993 WL 361792

21

at *7 (6th Cir., Sep. 16, 1993) ("the court will remand the case to the agency for further consideration only if 'the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture...'"); *Hernandez v. Astrue*, 277 Fed. Appx. 617, 623-24 (7th Cir., May 13, 2008) (failure to properly evaluate a claimant's obesity under Ruling 02-1p warrants no relief where such failure is harmless); *Ingram v. Astrue*, 2008 WL 2943287 at *5-7 (M.D. Fla., July 30, 2008) (same).

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  January 7, 2009                           /s/ Ellen S. Carmody
                                                ELLEN S. CARMODY
                                                United States Magistrate Judge