UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| LENA BIESCHKE, | Case No. 1:07-cv-1125 |
| Plaintiff, | HONORABLE PAUL L. MALONEY |
| v. | Magistrate Judge Ellen S. Carmody |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

**ORDER**

**Overruling the Plaintiff's Objections;
Adopting the R&R as Modified;
Affirming the Commissioner's Denial of DIB and SSI Benefits;
Terminating and Closing the Case**

Pursuant to 28 U.S.C. § 636 and W.D. MICH. LCIVR 72.2(b), this matter was automatically referred to United States Magistrate Judge Ellen S. Carmody, who issued a Report and Recommendation ("R&R") on Wednesday, January 7, 2009. "'Within ten days after being served with a copy of an R&R, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court.'" *Smiles v. City of Grand Rapids*, 2008 WL 5071723, *1 (W.D. Mich. Nov. 24, 2008) (Paul L. Maloney, C.J.) (citing 28 U.S.C. § 636(b)(1) and FED. R. CIV. P. 72(b) and W.D. MICH. LCIVR 72.3(b)); *see also Deruso v. City of Detroit*, 121 F. App'x 64, 66 n.2 (6th Cir. 2005). Bieschke timely filed objections on January 21, 2009, *see* FED. R. CIV. P. 6(a) & (b) (when calculating a period shorter than eleven days, the court must exclude

weekends and holidays, and the deadline is moved one day later if it falls on a weekend or holiday), and the court ordered the Commissioner of the Social Security Administration ("Commissioner") to file a response to the objections by March 6, 2009. The Commissioner did so.

## DISCUSSION

The R&R correctly concluded that substantial evidence in the record supported the ALJ's determination that Bieschke was not disabled from her alleged disability onset date (September 1, 2000) through her date last insured ("DLI"). Specifically, substantial evidence supported the ALJ's determination that Bieschke had two severe impairments – obesity and a back disorder – which rendered the 32-year-old unable to perform her past relevant work (as a nurse's assistant, deli manager, sales clerk, or building cleaner) but left a residual functional capacity ("RFC") sufficient for about 17,000 jobs in Michigan that involve only "light work", defined as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds. *See* 20 C.F.R. §§ 404.1567(b) and 416.967(b) for further definition of light work. These suitable jobs included light assembly (3,000 jobs regionally), sedentary assembly work (4,000 jobs regionally), and sedentary cashier work (8,000 jobs regionally). Tr 23 (citing Tr 596-98).

**Bieschke contends that the ALJ erred by failing to give controlling weight to her treating physician, Dr. Edwin T. Kornoelje, D.O.'s opinion regarding the sedative side effects of her painkilling medications.[1]** At the hearing before the ALJ, Bieschke's counsel asked Dr.

---

1

The Commissioner admits that Dr. Kornoelje qualified as Bieschke's treating physician since December 2002, *see* Commissioner's Brief at 4 (citing Tr 421), and the court finds that the number and frequency of Bieschke's visits to him, the nature and extent of their medical relationship, and his consequent familiarity with Bieschke's medical history and experiences, qualify Dr. Kornoelje as a treating physician. *See generally Pethers v. SSA*, 580 F. Supp.2d 572, 579 and n.16 (W.D.

Kornoelje, "Do you talk with your patients when you're prescribing drugs like Morphine or Valium about those potential side effects?" Tr 559. Dr. Kornoelje responded:

> Oh yea, yea, yea. You know I am, as many physicians are, leery of, a little bit leery of using these types, not because they don't want to treat somebody's pain. Certainly that's one of the things we need to do. It's just that because of several things related to those types [sic]. They have street value, which can be a problem and I'm not concerned about that at all with her, but also they can be quite sedating. And actually another thing as I'm looking, she's also on Neurontin which is a pain modulator. And so we have her on that which is not near [sic] as sedating. It may cause a little drowsiness as well, but certainly not near as sedating. So we try to use even that to maybe keep the Morphine down just a little bit. But you're going to get some sedation issues with Morphine as well.

Tr 559. When Bieschke's counsel asked Dr. Kornoelje "whether the Morphine has in fact been causing daytime drowsiness for her", the doctor responded as follows:

> She complains of being fatigued and tired and I believe, I'm just looking back, that she's had periodic labs that kind of looked at her blood count and she's not anemic and so forth, and so it certainly makes sense that if someone's taking that dose of Morphine that it's going to cause daytime tiredness and sleepiness.

Tr 560. The Magistrate correctly concluded that these statements by Dr. Kornoelje do not constitute a medical "opinion" under the applicable regulation because his statements

> *do not reflect any judgment about the nature of Plaintiff's impairments or articulate any limitations on her ability to function.* Rather, the doctor merely noted that Plaintiff's medications *could* cause drowsiness. The fact that a medication *can* cause drowsiness does not lead to the conclusion that the medication *does* cause drowsiness in any particular individual.

R&R at 17 (first emphasis added, other emphases in original). *See generally Ackermann-Papp v. SSA*, 2008 WL 314682, *2 (W.D. Mich. Feb. 4, 2008) (Maloney, J.) ("medical opinions" are "statements from physicians or psychologists or other acceptable medical sources that reflect

---

Mich. 2008) (discussing 20 C.F.R. § 404.1502's definition of "treating physician" and setting forth rules of thumb for determining whether a physician qualifies as a treating physician) (citing, *inter alia*, *Kornecky v. SSA*, 167 F. App'x 496, 506 (6th Cir. 2006) (p.c.) (Siler, Griffin, D.J. Katz)).

judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your mental or physical restrictions.") (quoting  20 C.F.R. § 404.1527(a)(2) and 20 C.F.R. § 416.927(a)(2)).

Dr. Kornoelje did testify about Bieschke's ability to perform daily living activities, but that testimony was based not on clinical tests or his own observations, but on conversations with Bieschke and her husband.  Accordingly, Bieschke has not shown that this portion of Dr. Kornoelje's testimony constitutes a "medical opinion", either.  *See Bradford v. SSA*, 2008 WL 398281, *11 (W.D. Mich. Feb. 11, 2008) (Maloney, J.) ("[M]ere *observations* about a claimant's condition do not qualify as 'medical opinions.'") (citing *Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007) ("Observations about plaintiff's gait and ambulation, then, are more like statements made by plaintiff about his conditions . . . ."), *reh'g & reh'g en banc denied* (6th Cir. Jan. 31, 2008)); *accord Hawkins v. Astrue*, 2008 WL 596153, *2 (M.D. Fla. Mar. 4, 2008) ("Plaintiff points out that Dr. King's notes state that Plaintiff came to his office 'complaining of significant exacerbation of her neck pain since the accident with pain radiating down both upper extremities.'  Although this note may be consistent with Dr. Kochno's notes, *it is merely a documentation of Plaintiff's subjective complaints, not a medical opinion.*") (record citations omitted, emphasis added).

Bieschke objects, "Dr. Kornoelje did not say that sedation was only a possibility.  He said, 'You're going to get some sedation issues with Morphine.'"[2] *See* Objections at 2.  Taking this

---

2

Bieschke later claims that "Dr. Kornoelje gave a treating source statement indicating that Morphine causes sedation, that he ruled out anemia as an explanation for Ms. Bieschke's fatigue, and that *with her dose of Morphine* 'you're going to get some sedation.'" Bieschke's Objections at 8 (emphasis added).  Bieschke has not supported this characterization of the doctor's testimony with actual evidence; she has not provided a citation for any testimony or written report where Dr. Kornoelje used the words "with her dose of morphine."  Nor has Bieschke identified any other words from which one may infer that Kornoelje was referring to the actual sedative effect of

generic statement by the doctor, Bieschke makes the conclusory assertion, "That statement reflects judgment about Ms. Bieschke's symptoms and what she can still do despite her impairments." *Id.* at 2-3. That is specious.

In the first passage, the doctor testified only that "drugs like Morphine or Valium * * * can be quite sedating", not that one of those drugs was in fact having such an effect on Bieschke. A drug's recognized potential or tendency to have a certain side effect is not equivalent to evidence that it actually had, or seemed to be having, that side effect on the individual in question to any given degree. *Cf. McKenzie v. SSA*, No. 99-3400, 215 F.3d 1237, 2000 WL 687680, *3 n.3 (6th Cir. May 19, 2000) ("Plaintiff contends that the ALJ did not properly consider the side effects of his medication . . . . Plaintiff asserts that because the Physicians Desk Reference includes drowsiness and dizziness as possible side effects of Darvocet and Somathe[,] medications Plaintiff is taking for his back, the ALJ was required to find that he was disabled. However . . . Plaintiff's treating physician, noted that Plaintiff did not experience any adverse side effects as a result of the

---

Bieschke's own morphine consumption rather than physicians' sedation concerns with morphine generally.

Bieschke concludes her objections by asserting, "Dr. Kornoelje gave a treating source statement indicating * * * that if someone's taking that dose of Morphine that it's going to cause daytime tiredness and sleepiness." Bieschke's Objections at 8. Again, however, Bieschke provides no citation to the record. It is not the court's job to scour the record to verify the accuracy of alleged quotations, and it will not do so. *See Andreas v. SSA*, 2009 WL 427377, *2 (W.D. Mich. Feb. 18, 2009) (Maloney, C.J.) ("It is not the court's job to scour earlier filings for reasoning *or citations* that Andreas failed to include in her objections, and the court will not do so.") (emphasis added) (citations and footnote 1 omitted); *cf. Alexander v. Atlantic Automotive Components*, 2008 WL 4283520, *10 n.30 (W.D. Mich. Sept. 16, 2008) ("Plaintiffs opted not to discuss any explanation they might have offered defendants for their misreports. The Court will not scour Plaintiffs' depositions in search of one."); *Garland v. Astrue*, 2998 WL 2397566, *5 (E.D. Ky. June 10, 2008) ("Plaintiff does not support this assertion with any citations to the record; that is, she does not provide any treatment dates with Dr. Sadasivan . . . to support her contention that [he] was her treating physician.").

5

medication. Moreover, the record does not show Plaintiff ever having complained of side effects to any other physicians who examined him. Therefore . . . Plaintiff's claim is without merit.").

In the second passage, the doctor effectively testified – though not with clarity – that because Bieschke complained of fatigue and her blood tests did not show anemia, her fatigue *might* be attributable to her morphine consumption. Testimony that "it certainly makes sense that" someone taking such dosage of morphine would feel fatigued, simply is not a statement that *Bieschke* in fact was feeling fatigued because of her morphine consumption. *See Runyan v. SSA*, 2009 WL 514106, \*6 (E.D. Mich. Mar. 2, 2009) ("While plaintiff does appear to take a variety of medication, there is nothing in the record to support the conclusions of *Dr. McIntosh, who does not actually opine that plaintiff has drowsiness, only that she is taking medications which **can** cause drowsiness.*") (emphasis added). Less still did Dr. Kornoelje's cited testimony evince any judgment about what Bieschke can or cannot still do in light of her fatigue. Bieschke's first objection patently lacks merit. Because Dr. Kornoelje did not render a medical opinion as the regulation defines that term, the presumption in favor of deferring to a treating physician's medical opinion never comes into play. *See, e.g., Stokes v. Astrue*, 274 F. App'x 675, 687 (10th Cir. 2008) ("Ms. Stokes argues the ALJ should have gone on to determine what weight he was giving the opinion. No error was made because this is not a medical opinion.").

**Bieschke next objects to the Magistrate's conclusion that the ALJ "provided a valid rationale for concluding that Plaintiff's medications do not cause the side effects alleged."** Bieschke's Objections at 3 (quoting R&R at 17). This objection ultimately lacks merit as well. The Magistrate accurately identifies at least two valid reasons for the ALJ's finding that, although Dr. Kornoelje testified that morphine (which Bieschke was taking) generally *could* be quite sedating,

6

it was not in fact so severely sedating in Bieschke's case as she claimed.

First, the Magistrate states that "the contemporaneous treatment notes of Plaintiff's care providers do not support Plaintiff's testimony that her medications compel her to sleep from 3-5 hours each day."  R&R at 18.  Bieschke complains that "[t]he R&R fails to cite the 'contemporaneous treatment notes' on which it relies to contradict the ALJ.  So it is impossible to judge whether the comment is grounded in the evidence."  Bieschke's Objections at 7.  But conversely, Bieschke fails to identify any treatment notes which state that her medications require her to sleep 3-5 hours during the daytime, or which might support that claim.  *See* Commissioner's Response to Objections at 3 ("Nothing in Dr. Kornoelje's statement or his treatment notes suggested that the morphine had the debilitating side-effects that Ms. Bieschke alleged.").  And Bieschke does not show that the Magistrate "contradicted" the ALJ on this score; the Magistrate wrote only that there were no contemporaneous treatment notes supporting Bieschke's claim about medication-induced daytime sleep, and Bieschke points to nothing in the record to undermine that statement.  The Magistrate is right that the absence of corroboration by contemporaneous treatment notes was a valid factor supporting the ALJ's rejection of Bieschke's claim that her medication causes her to need 3-5 hours of daytime sleep.[3]  *See, e.g., Deihl v. SSA*, 2008 WL 408463, *5 with n. 6 (W.D.

---

[3]

For example, Bieschke points to no evidence, in treatment notes or otherwise, that Dr. Kornoelje or any other physician advised her not to drive due to the drowsiness side effect of the morphine and/or Neurontin.  An ALJ may take the absence of such evidence as undermining a claimant's allegation that her medications make her so drowsy that the side effect presents another obstacle to holding down a job.  *See, e.g., Ditz v. SSA*, 2009 WL 440641 (E.D. Mich. Feb. 20, 2009), where the claimant contended that the ALJ did not properly consider the side effects of her medication, which "included feeling jittery, difficulty concentrating, and drowsiness." *Id.* at *2. Among other reasons for rejecting the claimant's objection, "the ALJ noted that none of Ditz' physicians, treating or consulting, had ever placed any restrictions on her activities except Dr. Penzler's advice not to drive when sleepy." *Id.* at *3.  Consequently, the district judge adopted the Magistrate's conclusion that the ALJ "had a reasonable basis to discredited [sic] Plaintiff's

Mich. 2008) (Maloney, J.) ("[T]he ALJ did not err in refusing to credit orthopaedist Dr. Thomas's opinion that Deihl's pain and other symptoms would cause him to need two to three unscheduled 15-minute breaks during each workday, because Dr. Thomas's *contemporaneous* treatment notes do not even mention such a limitation, let alone sustain it.") (collecting cases, including *Anderson v. SSA*, 195 F. App'x 366, 370 (6th Cir. 2006)).

Second, the Magistrate stated that in finding that Bieschke's medication did not require her to sleep in the daytime as much as she claims, "the ALJ noted Dr. Kornoelje's testimony that his concerns about the potential sedating effects of Plaintiff w[ere] lessened because she was also taking Neurontin." R&R at 18. Bieschke counters, without citation to the record, "Actually, what the ALJ said was, 'Although Dr. Kornoelje has suggested that the claimant may have some sedation issues with the use of Morphine, he has noted that with the prescription of Neurontin, he does not have the same sedation concerns.'" Bieschke's Objections at 3. As Bieschke accurately notes, Dr. Kornoelje testified that he had prescribed Neurontin to Bieschke, in addition to morphine, because he believed that Neurontin was generally less sedating than morphine, and he hoped to replace at least some of the morphine with Neurontin in her case.

Bieschke is correct that "that does not mean, as the ALJ implies, that Dr. Kornoelje no longer has concerns with the sedation." Bieschke's Objections at 3-4. With citations to the record, Bieschke demonstrates that despite the addition of Neurontin in October 2004, Dr. Kornoelje was not able to reduce her intake of the generally-more-sedating morphine, which began in about December 2004 at 30 mg twice per day. On the contrary, despite ever-increasing Neurontin doses,

---

testimony concerning her sleepiness to the extent that Plaintiff could perform a limited range of light inspection, small assembly and hand packaging work." *Id.* at *12.

Dr. Kornoelje found it necessary to also *increase* her morphine dosage to 30 mg *three* times per day (January 2005), then to 45 mg three times per day just two months later (March 2005). *See* Bieschke's Objections at 4-5 (citing AR 478-80 and AR 487). Thus, Bieschke is right up to a point: the fact that the doctor increased her morphine dosage even after starting and greatly increasing her Neurontin dosage does *not* support the notion that he no longer had concerns – or valid medical reason for concern – about the sedating effects of morphine in Bieschke's case. But, as discussed above, it is difficult to contort Dr. Kornoelje's testimony into an opinion regarding *actual* morphine-induced drowsiness in Bieschke's case.

<u>Third, the Magistrate stated that in finding that Bieschke's medication did not require her to sleep in the daytime as much as she claims, "[t]he ALJ noted Dr. Kornoelje's testimony that lab tests on Plaintiff's blood had revealed no evidence of abnormality."</u> R&R at 18 (citing Tr 21). Bieschke is correct that the blood test result to which Dr. Kornoelje referred in his testimony does *not* necessarily support the conclusion that Bieschke was not suffering from fatigue. *See* Bieschke Objections at 5. On the contrary, the thrust of Dr. Kornoelje's testimony was that because the blood test revealed no anemia – which could have accounted for her self-reported fatigue – that eliminated anemia as a possible cause of the fatigue and left Bieschke's medications as a possible source of the fatigue. But any error by the ALJ on this score was harmless. The ALJ's apparent misapprehension about the potential significance of Bieschke's negative anemia result does not change the fact that treating physician Kornoelje *never* rendered a medical opinion that her medications in fact made her drowsy, let alone that the resultant drowsiness required her to sleep any particular number of hours or at any particular intervals during the day. Bieschke concedes this, stating, "It is true that Dr. Kornoelje's opinion [sic] did not include a specific number of hours per day of sleep induced by the

[m]orphine." Bieschke's Objections at 7.

On balance, despite the two reasoning errors by the ALJ discussed above, there was substantial evidence to support the ALJ's rejection of Bieschke's claim about the extent and effect of her medications' drowsiness side effect. Consequently, the ALJ was not obligated to incorporate Bieschke's degree of claimed drowsiness into the hypothetical questions that he later posed to the vocational expert. *See Hall-Thulin v. SSA*, No. 96-1940, 110 F.3d 64, 1997 WL 144237, *2 (6th Cir. Mar. 27, 1997) ("[T]he ALJ did not have to accept Hall-Thulin's assertion that her medication makes her so drowsy that it creates an additional restriction on her ability to perform sedentary work. There was no requirement that the ALJ's hypothetical question to the VE reflect this unsubstantiated complaint.") (p.c.) (Lively, Nelson, Moore).

**Bieschke also objects to the ALJ's finding that she was "not fully credible."** Bieschke derides the "not fully credible" formulation and downplays the significance of a finding that a claimant is not fully credible, stating,

> Judge Prothro described Ms. Bieschke as not fully credible. She testified that she sleeps from three hours to five hours per day. If that means he thinks she sleeps five hours per day, but not every day, then she is not fully credible. If he believe[s] she sleeps every day, but not a full three to five hours, then she is not fully credible. But in either case, her need to sleep due to her high doses of morphine prevents her from performing any job.

Bieschke's Objections at 8. This objection lacks merit. First, this court is not authorized to independently assess the credibility of a claimant or any other witness in the first instance. *See Powers v. SSA*, 195 F. App'x 407, 412 (6th Cir. 2006) (Richard Allen Griffin, J.) ("We may not review the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.") (citing *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)). The court may ask only whether substantial evidence supported the ALJ's credibility determination, and here the answer is yes.

Preliminarily, "it is a claimant's 'responsibility to show, through objective medical evidence, that his subjective complaints are credible.'" *Luteyn v. SSA*, 528 F. Supp.2d 739, 742 (W.D. Mich. 2007) (Maloney, J.) (quoting *Rouse v. SSA*, 75 F. App'x 476, 478 (6th Cir. 2003) (p.c.) (citing 20 C.F.R. § 416.912(a))). Specifically, "[a]llegations of a medication's side effects must be supported by objective medical evidence." *Cross v. SSA*, 2008 WL 5071714, *6 (W.D. Mich. Nov. 24, 2008) (Quist, J.) (citing *Farhat v. HHS*, No. 91-1925, 972 F.2d 347, 1992 WL 174540, *3 (6th Cir. July 14, 1992)).

The ALJ did not err in concluding that Bieschke failed to carry this burden. *Cf., e.g., Hopkins v. SSA*, 96 F. App'x 393, 395 (6th Cir. 2004) ("The ALJ acknowledged that Hopkins did experience some discomfort. However . . . Although Hopkins complained of drowsiness, nausea, and blurred vision, these conditions were not documented in the record. [T]he ALJ did not commit reversible error in rejecting Hopkins' testimony."). The ALJ expressly noted several valid grounds for discrediting Bieschke's claims regarding the degree of her pain and functional limitations, especially the claim that her medications' side effects caused her to need several hours of sleep or more during the daytime each day.

First, Bieschke failed to complete several courses of prescribed physical therapy, and she sometimes failed to use the back-brace and walker that she had requested. An ALJ may properly consider the limited nature or extent of a claimant's treatment as evidence that her pain or physical limitation was not as severe as she claimed. This is true when the claimant was prescribed fairly minimal or infrequent treatment in the first place. *See, e.g., Howard v. Astrue*, 2007 WL 2688496, *14 (E.D. Cal. Sept. 10, 2007) ("*Given* the inconsistencies between claimant's subjective complaints, his daily and less frequent activities . . . and *his conservative treatment, this Court*

11

*concludes that the ALJ did not err in discounting as not credible Claimant's testimony*.") (emphasis added). The inference is equally valid, perhaps even more valid, when the claimant was prescribed treatment that was arguably consistent with her claimed pain or other problems but failed to follow the prescribed regimen. That is, the ALJ may take a claimant's failure to comply with medication, diet, exercise or other treatment prescriptions as undermining the credibility of her claims of pain and functional limitation. *See Schrader v. SSA*, 2008 WL 360649, *2 (W.D. Mich. Feb. 7, 2008) (Maloney, J.) (citing, *inter alia*, *Ealy v. SSA*, 172 F. App'x 88 (6th Cir. 2006) (p.c.) (C.J. Boggs, J. Batchelder, D.J. Weber) (upholding ALJ's determination that claimant's "claimed limitations 'were not fully credible' because they were 'inconsistent with . . . the lack of more aggressive treatment . . . and the claimant's ordinary activities.'")); *Myatt v. SSA*, 251 F. App'x 332, 336 (6th Cir. 2007) (*"The ALJ found Myatt to be not fully credible* due to inconsistencies between Myatt's testimony, medical history, and information he and his wife submitted to the SSA, and *due to Myatt's delay in seeking mental health treatment*. Accordingly, substantial evidence supports the ALJ's credibility determination . . . .") (emphasis added).[4] [5]

---

[4]

*Accord Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003); *Craig v. Chater*, 943 F. Supp. 1184, 1190 (W.D. Mo. 1996) (*"The ALJ specifically addressed the testimony of plaintiff's wife and found it not credible because it was inconsistent with* the medical evidence, *plaintiff's minimal medical treatment*, and the reports of treating and examining physicians.") (emphasis added).

[5]

If the claimant can show that his failure to obtain the prescribed medication, treatment, or equipment was attributable to lack of funds, an ALJ may reasonably decide that the failure to prescribe regimen does *not* undermine the credibility of his subjective complaints. *See Veltkamp v. SSA*, 528 F. Supp.2d 716 (W.D. Mich. 2007) (Maloney, J.), where this court reversed the Commissioner's denial of benefits and criticized the ALJ's determination that the claimant was not credible. This court wrote,

The ALJ also found significant Plaintiff's 'spotty history' of treatment for his mental

Moreover, Bieschke has not denied that the treatment notes of treating physician Kornoelje and other physicians stated that she retained normal sensation and strength. *Cf. Davis v. Astrue*, 2008 WL 154438, *9 (D.S.C. Jan. 14, 2008) (ALJ did not err in finding plaintiff not entirely credible; "although the claimant's medically determinable impairments could reasonably be expected to produce some of her alleged symptoms", the plaintiff's "complaints of inability to use her hands were inconsistent with medical evidence showing she had 5/5 grip strength in her left hand and 2/3 grip strength in her right hand, and that her activities of daily living were inconsistent with a complete inability to work.").

Whether this court would have found Bieschke to be credible regarding her need for daytime sleep or other issues is immaterial; substantial evidence in the record supported the ALJ's adverse credibility determination, so that determination "must stand." *Andreas v. SSA*, 2009 WL 427377, *17 (W.D. Mich. Feb. 18, 2009) (Maloney, C.J.).

**Finally, Bieschke seeks to impugn the impartiality and/or competence of the ALJ.** She attacks the ALJ as follows:

> If Dr. Kornoelje's statement had been interpreted in a manner most favorable to Ms. Bieschke, then another ALJ probably would have awarded benefits. ALJ James Prothro is notorious for denying cases. In 2005 and 2006 he denied 59 percent and 72 percent, respectively, of the cases he decided. That greatly exceeds the rates of the most experienced Judges in the Grand Rapids Hearing Office: Baldwin Ogden, 12 percent [in 2006] and 11 percent [in 2007]; William Decker, 19 percent and 19

---

illness. While the ALJ is not necessarily incorrect that Plaintiff 'has an inconsistent treatment record,' a closer examination of the issue is necessary. At the administrative hearing, Plaintiff testified that he has been unable to obtain treatment consistently because he lacks insurance or other means to pay for such.

*Veltkamp*, 528 F. Supp.2d at 726. But Bieschke has not alleged that she failed to complete prescribed physical therapy because she was impecunious. Nor can the court discern how Bieschke's inconsistent use of the back-brace and walker could have been caused by lack of funds.

13

    percent; and Douglas Johnson, 17 percent and 13 percent . . . .

Bieschke's Objections at 7-8.  Bieschke's counsel is admonished that such statistics are irrelevant here.  This court lacks the authority to view the evidence or the ALJ's opinion differently based on the notion or perception by some that the particular ALJ is "pro-benefits" because he grants applications more often than other ALJs, or "pro-Commissioner" because he denies applications more often than other ALJs.  Bieschke's counsel seems to be accusing the ALJ of denying his client's application because the ALJ personally *wanted* to deny the application regardless of the evidence, not because the ALJ arrived at an honest, if (in Bieschke's view) incorrect, view of the record.  Bieschke's counsel fails to identify any inappropriate comments by the ALJ which might serve as evidence of personal bias or animus against his client, or against disability claimants generally.  *Contrast Lewis v. Astrue*, 2008 WL 4330458, *5-6 (E.D. Cal. Sept. 19, 2008) (remanding for a new hearing before a different ALJ) ("[T]he ALJ preempted the hearing and accused plaintiff of lying, doctor shopping and having an attitude problem. * * *  More troubling, however, is the ALJ's lengthy colloquy about his colleagues and other claimants who continue to work despite injuries or medical conditions.  These reference[s] to extra-record factual information appear to have actually influenced the outcome of his decision.  His comments suggest . . . a preconceived opinion regarding plaintiff's alleged disability that appears to have been improperly informed by 'extrajudicial' sources.").

  This court may inquire only whether substantial evidence in the record supported the ALJ's conclusion, and it will not be distracted from that task by counsel's *ad hominem* attack on the ALJ.  Such a tactic neither serves his client's interests nor reflects well on counsel.  On the contrary, it tends to undermine counsel's credibility.  *See Rangle v. SSA*, 138 F. App'x 921, 930 (E.D. Mich.

2001) (Lawson, J.) (although the ALJ made errors warranting reversal, "[P]laintiff's hyberbolic and *ad hominem* attack on the ALJ's integrity overstates the case and seriously undermines the persuasive force of plaintiff's argument . . . .").

**In conclusion,** "[o]n this record, the most the court can say is that some evidence arguably supported the argument that [the claimant] was disabled during the insured period, *not* that the ALJ was *compelled* to reach that conclusion." *Holland v. SSA*, 528 F. Supp.2d 728, 730 (W.D. Mich. 2007) (Maloney, J.). Nor is Bieschke entitled to the remand that she seeks.

### ORDER

Accordingly, having reviewed the complaint, the R&R, and plaintiff's timely objections:

The plaintiff's objections [document # 14] are **OVERRULED.**

The Report and Recommendation [document # 12] is **ADOPTED as modified**.

The Commissioner's denial of disability benefits is **AFFIRMED**.

The complaint is **DISMISSED.**  This case is **TERMINATED.**

**This is a final and appealable order.**

**IT IS SO ORDERED this 12th day of March 2009.**

/s/ Paul L. Maloney
Paul L. Maloney
Chief United States District Judge